## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES *ex rel.* MARK J. HARVEY | UNDER SEAL |
| Plaintiff/Relator, | Civil Action No. _____ |
| v. | |
| ADVANCED BIOHEALING, INC. | |
| Defendant. | |

## COMPLAINT

Plaintiff/Relator Mark J. Harvey, for his complaint against Defendant Advanced BioHealing, Inc., alleges as follows:

## INTRODUCTION

1.    This is an action to recover damages and civil penalties on behalf of the United States, brought by Plaintiff as *qui tam* relator pursuant to the False Claims Act, 31 U.S.C. §§3729 *et seq.* (the "FCA" or the "Act").

2.    Defendant Advanced BioHealing, Inc. ("ABH"), headquartered in Westport, Connecticut, "develops and commercializes living cell therapies" that are used to regenerate human tissue and assist in wound healing.

3.    ABH's primary product is Dermagraft, a "bio-engineered skin substitute" that has been FDA-approved to treat diabetic foot ulcers ("DFU").

4.    Founded in 2003, ABH employs approximately 350 people worldwide and generates approximately $225 million in revenue per year.



5.      One of ABH's core markets for Dermagraft is the Veterans Health Administration ("VA"). The VA is the "United States' largest integrated health care system consisting of 153 medical centers, in addition to numerous community-based outpatient clinics, community living centers, Vet Centers and Domiciliaries." *See* http://www.va.gov/health/MedicalCenters.asp.

6.      Together, such facilities "provide comprehensive care to over 5.5 million Veterans each year." *Id.*

7.      A significant percentage of the veteran patient population suffers from DFUs, a common complication of diabetes.

8.      In order to sell to the VA, ABH was required to obtain a Federal Supply Schedule ("FSS") contract.

9.      ABH was awarded that FSS contract, FSS-V797P-4155b, on November 29, 2008. The effective date of the contract is December 1, 2008 and it expires on November 30, 2013. A copy of the FSS contract is attached hereto as Exhibit A.

10.      The contract provides for sales of Dermagraft to the VA at a per-piece cost of $1,360.52.

11.      Plaintiff, Mark J. Harvey, is a former employee of ABH. Harvey worked for ABH from November of 2008 until late 2009.

12.      Harvey worked as a Sales Representative and was assigned to the VA division, traveling across the country to market Dermagraft to VA hospitals and outpatient clinics.

13.      Harvey reported directly to Todd Clawson, ABH's Vice President of Sales.

2

7

14.     Harvey left the company in late 2009 and began working with one of its competitors, Soluble Systems, LLC.

15.     Harvey worked at Soluble Systems, LLC for over a year, but recently left his position there due to difficulties competing with Dermagraft.

16.     Currently, Harvey is employed by MPM Medical.

17.     Relator alleges that ABH routinely and systematically violates the FCA by providing remuneration to VA physicians, nurses, and other personnel in order to induce them to use Dermagraft.

18.     Such remuneration includes, but is not limited to, valuable gifts (such as rare gold collector coins, gift cards, spa visits, etc.), tickets to sporting events, concerts, and other recreational activities, and all-expenses paid trips to Las Vegas, the Caribbean, Hawaii, and other destinations.

19.     The resources for such lavish gifts and other remuneration are provided to sales representatives by ABH.

20.     By providing those gifts and other remuneration to VA employees as an inducement to the purchase of Dermagraft, ABH has violated the Anti-Kickback Statute, ("AKS"), 42 U.S.C. §1320a-7b(b).

21.     By submitting claims for payment for the Dermagraft sales obtained in violation of the AKS, ABH violated the FCA. In addition, ABH also violated the FCA by falsely certifying its compliance with the AKS.

22.     ABH's unlawful "marketing" program has been hugely successful—orders of Dermagraft by VA physicians have grown exponentially in just over two years, even though

3

8

cheaper and more effective alternatives are available, costing the Government millions of dollars and potentially jeopardizing the health of our veterans and soldiers.

## JURISDICTION AND VENUE

23.    This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. §1331 and 31 U.S.C. §3732.

24.    This Court has personal jurisdiction over ABH because it transacts business in the District of Columbia.

25.    Venue is proper in this Court because ABH transacts business in the District of Columbia.

## PARTIES

26.    Relator is a former employee of ABH, and during that period of employment he lived in Spring City, Pennsylvania.

27.    While working at ABH, Harvey's sales territory extended across the Northeast and included Ohio, West Virginia, Pennsylvania, New Jersey, Maryland, Delaware, New York, and the District of Columbia.

28.    Defendant ABH is a manufacturer and seller of regenerative medicine products, including Dermagraft, and has its primary place of business in Westport, Connecticut.

29.    Defendant ABH is a "person" within the meaning of 31 U.S.C. §3729(a) and the legal authority interpreting that provision.

30.     The United States is herein named a Plaintiff pursuant to the False Claims Act, 31 U.S.C. §3729, *et seq.*, as funds of the United States through the Department of Veterans Affairs ("DVA"), through the Veterans Health Administration ("VA"), have been directly or indirectly disbursed and awarded to Defendant, as a result of the knowingly false statements and false claims alleged in this Complaint made by or caused to be made by Defendant.

## FACTS

31.     Paragraphs 1 through 30 are incorporated herein by reference.

32.     Dermagraft is "cryopreserved human fibroblast-derived dermal substitute." *See* http://abh.com/dermagraft-fact-sheet.html.

33.     In lay terms, Dermagraft is a faux skin tissue derived from newborn foreskin tissue.

34.     ABH manufactures Dermagraft by taking fibroblast cells from the foreskin tissue and "seed[ing] [them] onto a bioabsorbable polyglactin mesh scaffold." *Id.* Then, the "fibroblasts proliferate to fill the interstices of this scaffold and secrete human dermal collagen, matrix proteins, growth factors, and cytokines to create a three-dimensional human dermal substitute containing metabolically active, living cells." *Id.*

35.     Dermagraft is "supplied frozen in a clear bag containing one piece of approximately 2" x 3" for a single-use application." *Id.*

36.     Dermagraft is only indicated for "use in the treatment of full-thickness diabetic foot ulcers [DFUs] greater than 6 weeks duration, which extend through the dermis, but without tendon, muscle, joint capsule, or bone exposure." *Id.*

5

37. Dermagraft has not been approved for any other applications.

38. In order to achieve wound healing, Dermagraft must be applied weekly and is often reapplied numerous times.

39. It has been indicated for "up to eight weekly applications over a twelve-week period." *See* http://www.abh.com/press_releases/pr_070610.html.

40. At the prices charged by ABH to the VA, an eight-week treatment regimen of Dermagraft may cost upwards of $10,000.

41. Once purchased, Dermagraft is delivered frozen in a clear bag.

42. It must be used within 96 hours or be kept frozen in a specially designed freezer. If it is not used immediately, it can be kept frozen for six months. After that time, it is no longer usable and must be discarded.

43. At all times material to this Complaint, Title 38 of the United States Code, 38 U.S.C. §§1701 *et seq.* established a federally funded health care insurance program for veterans (the "Veterans Health Program"). Under the Veterans Health Program, the United States purchases the drugs, equipment and/or medical supplies provided to veteran patients by pharmaceutical and medical equipment suppliers.

44. At all times material to this Complaint, ABH had a Federal Supply Service contract with the United States.

45. At all times material to this Complaint, ABH received a substantial portion of its income from the United States through its sales to the Veterans Health Program. Via its Federal Supply Service contract, ABH sold, and continues to sell, Dermagraft to the

6

11

Veterans Health Program. ABH submits, or causes to be submitted, claims for the costs of Dermagraft to the United States through the Veterans Health Program.

46.    ABH has routinely submitted, and/or caused to be submitted, false and fraudulent claims to the United States through the Veterans Health Program, and it has done so "knowingly" as provided in the Act.

47.    ABH has regularly and systematically violated the AKS.

48.    ABH also submitted false claims to the United States when it certified, on numerous occasions, that it was in compliance with the AKS (and other laws and/or regulations), which is a condition of payment for suppliers selling to the United States Department of Veterans Affairs.

49.    The AKS prohibits any person from knowingly and willfully offering to pay any remuneration to another person to induce the purchase, order, or recommendation of any good or item for which payment may be made in whole or in part under a Federal health care program.

50.    A "Federal health care program" is defined as "(1) any plan or program that provides health benefits, whether directly, through insurance, or otherwise, which is funded directly, in whole or in part, by the United States Government (other than the health insurance program under chapter 89 of Title 5); or (2) any State health care program, as defined in section 1320a-7(h) of this title." *Id.*, at §1320a-7b(f).

51.    The Veterans Health Program is a Federal health care program, as defined by 42 U.S.C. §1320a-7b(f).

52.     As part of the Patient Protection and Affordable Care Act of 2010 ("PPACA"), Pub. L. No. 111-148, §6402(f), 124 Stat. 119 (codified at 42 U.S.C. 1320a-7b(g)), Congress recently amended the AKS to confirm that a "claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the False Claims Act]."

53.     ABH knowingly and willfully offered to pay, and paid, remuneration to VA physicians and other personnel, in order to induce the purchase, order, or recommendation of Dermagraft.

54.     ABH regularly and systematically submitted, or caused to be submitted, claims for Dermagraft that resulted from a violation of the AKS.

55.     The fraudulent practices in which ABH routinely engaged are detailed below.

**ABH's Remuneration-Based "Marketing" Program**

56.     Harvey worked for ABH for just over one year. During that time, he witnessed rampant use of remuneration by ABH sales representatives.

57.     Upon joining the Company, he attended a training conducted by Keith O'Briant, Tony Ezell, and Sean McCormack.

58.     At that time, O'Briant was the Vice President of Sales; now, he is ABH's Senior Vice President of North American Sales.

59.     Ezell is the Western Regional Sales Director and McCormack is the Eastern Regional Sales Director.

8

13

60.     During the training, O'Briant informed Harvey and the other ABH sales representatives attending the training, that they would each be provided with a monthly "entertainment" budget ranging from $6,000 to $8,000.

61.     O'Briant further explained that, in addition to the sales representative's travel expenses, which usually ranged from $1,000 to $1,500 per month, the budget was to be used for "entertaining" VA employees, purchasing gifts for those employees, and providing other remuneration to them.

62.     Harvey and the other ABH sales representatives were required to submit expense reports and/or receipts in order to account for the budget funds they spent each month.

63.     Harvey, and other ABH representatives, were instructed by O'Briant and other ABH leaders to spend their full "entertainment" budget each month. If the full budget was not used, sales representatives were often admonished by their bosses.

64.     It was an unwritten, but well recognized, rule at ABH that the "entertainment" budget was to be used to buy gifts and other remuneration for VA physicians, administrators, nurses, and other health care professionals—all of whom ABH was courting for sales of Dermagraft.

65.     ABH sales representatives were required to submit expense reports and/or receipts to their ABH bosses in order to obtain reimbursement for the gifts they paid out of their "entertainment" budgets.

66.     ABH leaders often expressed concerns over the expense reports and/or receipts submitted by sales representatives, implying that they raised the specter of fraud.

9

14

67.     For example, around September of 2009 (a few months before Harvey left ABH), he was instructed by his immediate superior, Todd Clawson, to falsify his expense report, which had indicated that he spent over $3,000 on tickets to a baseball game that he provided to VA personnel.

68.     Clawson told Harvey that such expenditures did not "look good" and that, instead, he should falsely report that he spent the funds on three educational dinners at a cost of $1,000 each.

69.     At ABH's bi-yearly meeting for all sales representatives, Harvey and his sales representative colleagues were told to make all of their receipts and expense reports "look educational" in nature, even though the company leadership knew they were not.

70.     Harvey followed such instructions and all of the expense reports he submitted to Clawson for reimbursement were approved.

71.     From approximately November of 2008 until June of 2009, there were approximately six ABH sales representatives devoted to selling to the VA.

72.     Assuming that each sales representative followed O'Briant's instructions and, like Harvey, spent between $4,500 and $7,000 per month on gifts and other remuneration, between $189,000 and $294,000 was given to VA employees by ABH during that time period.

73.     From approximately July of 2009 until November of 2009, the number of ABH sales representative increased to 11. Applying the assumptions discussed above, between $198,000 and $308,000 was given to VA employees by ABH during those four months.

74. From December of 2009 until June of 2010, the ABH VA sales force increased to 15 sales representatives. Thus, during that time period, the amount spent on gifts and other remuneration was approximately $405,000 to $630,000.

75. Finally, from approximately July of 2010 until the present date, ABH has dedicated 25 sales representatives to its VA market. This amounts to approximately $1 million to over $1.5 million in gifts and other remuneration.

76. In total, ABH has provided between approximately $1.8 and $2.8 million in remuneration to the VA employees it is wooing for sales of Dermagraft.

## Demonstrative Examples of ABH's Gifts and Other Remuneration to VA Personnel

77. ABH Manager, Todd Clawson, and Mr. Harvey paid VA Chief of Podiatry at the Cleveland VA hospital, Dr. Howard Kimmel, a cash "retainer" and "speaking fees" for endorsing Dermagraft at various industry dinners and events.

78. ABH also paid for Dr. Kimmel's travel expenses to and from such events.

79. On one occasion, Harvey drove Clawson to pick up Dr. Kimmel at the airport. On the way to the event, Clawson handed Dr. Kimmel an envelope, telling him "here's your money."

80. During such trips, Clawson and Harvey took Dr. Kimmel to very expensive dinners and nightclubs and/or bars.

81. At Clawson's instruction, ABH sales representatives (including Harvey) invited numerous VA physicians to an "ABH Diabetic Foot Advisory Board" meeting in August of 2009. In a July 16, 2009 e-mail, Clawson told the sales representatives to "email [their] providers" regarding attendance at the meeting and, for those providers whose

11

attendance was "confirmed[,]" "they can book their own travel and we will give them a reimbursement from for expenses." Further, ABH provided "compensation for their time."

82.     The meeting, held at ABH's La Jolla location, included a "welcome dinner" as well as a "keynote presentation" and "workshops." As of the date of Clawson's e-mail, five physicians were "confirmed" and approximately nine others were "pending." *Id.* Those physicians that conducted Dermagraft "case studies" were paid between $1,000 and $2,000 by ABH.

83.     ABH Sales Representative Hal Purdy purchased several thousand of dollars worth of rare gold coins for Dr. Francis Derk, Chief of Podiatry at the VA hospital in San Antonio, Texas. For approximately four months, from May of 2009 to September of 2009, Purdy delivered the gold coins to Dr. Derk, who is an avid coin collector.

84.     In the fall of 2009, ABH Sales Representative George McNeely took Dr. Ross Talerico, Chief of Podiatry at the VA hospital in San Francisco, California, to a concert.

85.     In November of 2009, ABH Sales Representative Ken Daniels purchased 10 or 12 tickets to an Indianapolis Colts NFL football game and gave them to several podiatrists and resident physicians working at the VA hospital in Indianapolis, Indiana.

86.     ABH Sales Representative Hal Purdy gave Dr. Derk an iPhone on or about April of 2009. In a June 2, 2009 e-mail, Clawson thanked Purdy for being ABH's "pioneer" regarding the iPhones "resource" and told other sales representatives that "I Phones [sic] are in the mail[.]"

87.     In September of 2009, ABH Sales Representative Lex Harris purchased tickets to a Kings of Leon concert and gave them to Dr. Phillip Varca, a podiatric surgeon, and several other surgeons working at the VA hospital in Durham, North Carolina.

88.     Purdy gave Dr. Rose Marie Resendez, and her receptionist, spa services worth $800 at an upscale day spa.

89.     ABH Sales Representative Steve Blocker gave several VA resident physicians tickets to several Chicago White Sox and Chicago Cubs baseball games in August of 2009 and accompanied them to the games.

90.     On or about September of 2009, ABH Sales Representative Ricky Palmer purchased medical textbooks for numerous VA resident physicians and paid for their required testing examinations.

91.     For two years straight (2009 and 2010), ABH's upper management (including ABH Manager Todd Clawson) and VA sales representatives (including Harvey) hosted over 100 VA physicians and administrators (including the Director of Podiatry for the VA Hospital System, Dr. Jeffrey Robbins) at expensive dinners over three consecutive evenings. Such expenditures totaled over $20,000.

92.     One VA physician, Rodney Harris, described the events to Harvey as "a huge and decadent ABH pep rally" where there are "no speakers or any discussions remotely close to being educational in nature." He added that it "appeared as if there wasn't any need to discuss VA health care issues" because the providers seemed to know "why [they] were there."

93.     ABH Sales Representative Bill Giltner gave seven VA physicians and resident physicians, all based out of Denver, Colorado, tickets to a Denver Broncos football game.

94.     Giltner also paid for roundtrip airfare for five VA resident physicians to fly from Colorado to Arizona in order to attend the Desert Foot Conference in October of 2009.

95.     At a 2009 ABH workshop held in Las Vegas, Nevada, Clawson approached VA nurse practitioner Kelly Garbellotti and her husband in a hotel lobby. Clawson shook Garbellotti's hand and, when doing so, placed a $100 bill in her hand. When Garbellotti pulled back her hand, the bill fell on the floor. Garbellotti later told Harvey that the exchange was embarrassing and that, at the time, Clawson told her that the bill was gambling money.

96.     In early 2009, Clawson also told Harvey that he could pay for examination fees for VA resident physicians working in Baltimore, Maryland. After doing so, the number of orders of Dermagraft by those physicians increased.

97.     In mid-2009, Clawson and ABH Vice President Keith O'Briant accompanied Dr. Howard Kimmel to a podiatry conference, where Dr. Kimmel made a presentation on Dermagraft. All of Dr. Kimmel's travel expenses for the conference were paid by ABH, including airfare, hotel, meals, and entertainment, at a cost of over $5,000.

98.     In addition to these specific examples, it was commonplace amongst ABH sales representatives to buy, each month, several hundred dollars' worth of gift cards and pass them out to physicians, nurses, administrative staff, and other personnel working at the VA hospital(s) in their territories.

105. Furthermore, the freezer was "reserved solely for storage of DERMAGRAFT."

106. In short, the hospitals had to buy, and presumably keep buying, Dermagraft in order to get the free freezer. A copy of the lease agreement is attached hereto as Exhibit B.

**ABH's Fraudulent Scheme Is Supported by Documentary Evidence**

107. Documents show that ABH regularly and systematically gave gifts and other remuneration to Government physicians and other personnel, and that such practices were encouraged, and even mandated, by ABH management.

108. For example, in a November 22, 2009 e-mail, ABH Sales Representative Ricky Palmer reported back to Clawson about his "huge success" recruiting VA doctors at the Desert Foot Conference.

109. Palmer states that he "secured a great relationship with Dr. Margiotta during dinner and asked him point blank 'so when are we going to get started with Dermagraft?'" According to Palmer, Dr. Margiotta responded "I can't believe we already have not, lets [sic] get started ASAP."

110. Palmer also reported back to Clawson about his "great relationship" with several VA resident physicians working in Phoenix, Arizona.

111. After learning from the doctors that they wanted an expensive textbook, Palmer "purchased the textbook for each of them."

112. Palmer further reported:

I can't say how much they appreciated it. **All three of them texted me afterwards and told me how much they appreciated all that I do for them, and they will do everything they can do [to] increase their usage of Dermagraft.** They also expressed to me that I don't just care about my

16

ment 15
product, but really care about their education and I help to provide so many resources for them.

113. Clawson forwarded Palmer's recap to numerous other ABH sales representatives, thanking him and stating that Palmer was a "GAME CHANGER" and that he "continually help set the pace for living the 'PARTNERSHIP FUNDAMENTAL" advocated by ABH.

114. ABH leaders continually stressed "developing relationships" with VA physicians, nurses, and other medical professionals and making those persons "advocates" of ABH and the Dermagraft product.

115. In Clawson's words, "We need to develop advocates in every Account and Department—Our top Clinics have Champions, and when there has been an issue they take care of it for us."

116. Clawson instructed his sales representatives to "[e]stablish a champion in each clinic to help identify patients [to prescribe Dermagraft to]."

117. According to Harvey, this language is code for incentivizing the VA employees to use Dermagraft through the use of gifts.

118. For example, on November 11, 2009, Clawson sent an e-mail to the ABH sales force, as well as ABH leaders Keith O'Briant, Sean McCormack, and Tony Ezell. In this e-mail, which he titled "Best Practices from the VA Model of Success," Clawson noted that Dr. Derk, a VA physician, was an "Advocate" who was "set to light the lamp at Desert Foot [Conference] for all of us and sharing the Healing Power of Dermagraft[.]"

17

22

119. Further, in a paragraph he headed as "**Advocacy/Relationships[,]**" Clawson noted that another ABH sales representative had "a great dinner Friday night with Podiatry in Buffalo" and, three days later, "[h]e got 6 new patients."

120. Just a few months earlier, Clawson sent another e-mail to his sales force, copying executive O'Briant, regarding ABH's second quarter results. In it, he stressed that the sales team had "[d]eveloped three of the strongest advocates and supporters of Dermagraft—Kimmel (Cleveland), Derk (Audie Murphy), Talarico (San Francisco)[.]"

121. In another example, Clawson advised Harvey to buy numerous gifts for a nurse practitioner, Kelly Garbelotti, who was advocating the use of Dermagraft amongst her colleagues.

122. Specifically, in May of 2009, Clawson told Harvey that Garbelotti was "key" and asked if she "like[d] hockey" because he would "take her to the game." He also asked if she needed a camera for her work.

123. When Harvey suggested buying her "tanning [gift] cards or even a makeover (hair) before her [upcoming vacation] trip[,]" Clawson responded by asking if there was anything "travel related" and telling Harvey to get her an "amex gift card for 100" and to "have dinner on me with a card of thanks."

124. A few months later, ABH paid for Garbelotti to travel to Las Vegas, Nevada and to Arlington, Virginia.

125. E-mail correspondence confirms that ABH spends thousands of dollars on remuneration paid to VA medical personnel.

126.     Clawson and Harvey took two VA doctors, Dr. Leneau and Dr. Harris, to a baseball game in June of 2009—the tickets alone cost over $500.

127.     In October of 2009, Harvey spent over $2,600 on six tickets to a National League Championship Series baseball game, to which he took several VA physicians.

128.     Around the same time, he spent over $600 on four tickets to a NFL game in Baltimore, Maryland, where he again hosted Dr. Harris and Dr. Leneau.

129.     A particularly telling example of the remuneration-based "relationships" forged between ABH sales representatives and VA physicians and medical personnel is evidenced by an e-mail sent by VA podiatrist Danae Lowell to Clawson.

130.     In her e-mail, Lowell shared her opinions on a candidate who had applied for a different sales representative position within ABH.  Lowell explained that she had "concerns" about the candidate, even though she is "nice" and "brings breakfast, lunch, and occasionally snacks around."

131.     According to Lowell, her concerns stemmed from the candidate's relationship with Dr. Kimmel, another VA physician.  Lowell stated that the candidate had been "whisked away from us" by Dr. Kimmel, keeping her from "getting close to us." *Id.*

132.     Lowell further explained that she is "currently applying the most grafts and have been for weeks possible months[,]" because "of the relationship that [she has] developed with [her] current reps" who made her "feel part of something special and important."

133.     Lowell added that, as a result, she had "been going above and beyond to extend myself to them [ABH representatives] and provide them with additional opportunities

to succeed." She noted that "[t]his is proven by the addition of SCI and BV [two potential off-label uses of Dermagraft]."

134.   As Lowell put it, "[s]ince ABH is Kimmel's company—his own words- and [the candidate] Amy is Kimmel's rep-her own words, I fear that my connection will be inevitably destroyed [if Amy is hired]."

135.   Lowell's e-mail exemplifies the *quid pro quo* nature of the relationships between ABH sales representatives and VA physicians, showing that VA doctors used Dermagraft because of those "relationships" rather than solely based on their sound medical judgment.

## ABH Falsely Certified Its Compliance with the AKS

136.   In its FSS contract with the Government, ABH certified that it complied with various federal regulations.  *See* Exh. A.

137.   Specifically, line 27a of the FSS contract states "SOLICITATION INCORPORATES BY REFERENCE FAR 52.212-1, FAR 52.212-4, FAR 52.212-3 AND FAR 52.212-5 ARE ATTACHED.  ADDENDA."

138.   Moreover, the "Summary of Award" document attached to the Contract, which is labeled "Addenda to SF 1449," states that "**The Contract consists of the following documents:**" and lists, as the first item, "(a) FAR 52.212-4 Contract terms and conditions – Commercial Items and Addenda."

139.   Importantly, one of the provisions of FAR 52.212-4, which as incorporated into the FSS Contract, states as follows:

> (q) Other compliances. The Contractor shall comply with all applicable Federal, State and local laws, executive orders, rules and

99.     In 2009 alone, Harvey estimates that ABH sales representatives gave VA hospital employees over $15,000 worth of gift cards, including gift cards from retailers such as Target and Old Navy, as well as Visa gift cards and gift cards for groceries and gas.

100.    ABH representatives also regularly took VA physicians and other hospital personnel to expensive dinners, as well as had food and gifts delivered to hospitals and other office locations.

101.    Some VA physicians went to extreme measures to ensure that such remuneration would continue.  For example, Harvey was informed by his colleague, ABH Sales Representative Steve Blocker, that he had such a good "relationship" with the VA resident physicians at the Jesse Brown VA Medical Center in Chicago, Illinois, that they would throw away unused pieces of Dermagraft, and then order more, in order to keep sales up.

102.    Blocker told Harvey that if one of the doctors' patients missed his or her appointment to have Dermagraft applied, the doctor would flush the piece of Dermagraft down the toilet, rather than put it back in the freezer for later use.  The doctor would then falsify the patient's chart, indicating that the Dermagraft had been applied, and the application was billed to the Government.

103.    ABH sales representatives also provided VA hospital staff with expensive freezers, intended to house the Dermagraft product, at no cost.

104.    ABH would "loan" the freezers to the hospital for free, provided that the hospital agreed to make an initial order of *at least* five pieces of Dermagraft *and* that "all future orders [of Dermagraft] will be a minimum of five pieces of DERMAGRAFT."

15

regulations applicable to its performance under this contract. 48 C.F.R. §52.212-4.

140.    When it entered into its FSS Contract with the Government, ABH expressly certified that it would comply with, amongst other things, "all applicable Federal, State, and local laws." *Id.* This includes the AKS.

141.    Yet, at the time that ABH entered into this contract, it was knowingly utilizing a "marketing program" that involved rampant payment of gifts and other remuneration to VA Medical Center personnel in order to induce purchases of its expensive, and medically inferior, Dermagraft product.

142.    ABH is also liable under the FCA pursuant to the theory of "implied certification."

143.    Under this theory, even if the remuneration-tainted claims made to the Government for Dermagraft did not contain an *explicit* certification of compliance, compliance with such statutory, regulatory, or contractual prerequisites or conditions of payment is implied.

144.    ABH's compliance with the AKS—a condition of payment for claims made to the United States Department of Veterans Affairs—was implied in every claim that it made, or caused to be made, to the Government.

145.    Yet, by paying remuneration to VA officials in order to induce purchases of Dermagraft, ABH was knowingly violating the AKS and, in turn, the FCA.

**Dermagraft Is More Expensive and Less Effective than Competing Products**

146.    There are two primary competitors of Dermagraft—Apligraf and Theraskin.

147.    Both products are more effective than Dermagraft, and Theraskin is significantly less expensive.

148.    Both products—Apligraf and Theraskin—do not need to be applied as frequently as Dermagraft.

149.    Yet, despite these advantages, sales of Dermagraft to the VA have significantly outpaced both Apligraf and Theraskin for the past several years.

150.    Dermagraft has essentially become the "standard of care" within the VA, and neither Apligraf nor Theraskin has been able to capture any sizeable amount of VA business.

151.    Apligraf is sold by Organogenesis, Inc., a company based out of Canton, Massachusetts.

152.    Apligraf is indicated for use treating both DFUs and venous leg ulcers, another condition commonly endured by persons suffering from diabetes.

153.    Apligraf is supplied in one size—a circular disk of approximately 75 mm in diameter.

154.    Apligraf is sold for approximately $1,000 to $1,200 per disk.

155.    Apligraf is generally applied once every two to three weeks, whereas Dermagraft is applied weekly.

156.    A 2001 study of Apligraf showed that after 12 weeks of treatment with Apligraf, 56% of DFUs closed and/or "healed."

157.    Approximately nine years later, another Apligraf study was conducted and showed that after 12 weeks of treatment with Apligraf, 55.2% of DFUs closed.

158.     Theraskin is sold by Soluble Systems, LLC, a company based out of Newport News, Virginia.

159.     After leaving his job at ABH in late 2009, Harvey joined Soluble Systems as a sales representative marketing its Theraskin product.

160.     Theraskin is made from donated human skin cells and is available for purchase in two sizes.

161.     It is also significantly less expensive than Dermagraft. The smaller piece of Theraskin is sold for approximately $395. The larger piece of Theraskin, equivalent in size to a piece of Dermagraft, is sold for approximately $695, about half the cost of Dermagraft.

162.     Unlike Dermagraft, Theraskin is indicated for use in the treatment of not only DFUs, but also venous leg ulcers, some surgical wounds, and pressure sores.

163.     A study of Theraskin's effectiveness was conducted by, amongst others, Dr. Adam Landsman of Harvard Medical School, and showed that approximately 60.4% of DFUs closed after 12 weeks. On average, the number of Theraskin applications was two, at an estimated cost of $1,400 total (assuming the large piece of Theraskin was used).

164.     A similar study of Dermagraft showed that compared to the traditional therapy of moistened gauze, Dermagraft "increased the proportion of diabetic foot ulcers that heal at 12 weeks by 64%[.]"

165.     However, up to eight applications of Dermagraft were used, at a cost of up to $10,400 per patient.

166.     As compared to the studies of Theraskin and Apligraf, the Dermagraft study showed that only 30% of patients' DFUs healed after 12 weeks.   This is significantly fewer than the Apligraf studies (56% and 55.2%, respectively) and the Theraskin study (60.4%).

167.     According to these studies, Dermagraft is much less effective at healing patients' DFUs after 12 weeks of treatment.

168.     Furthermore, the per patient cost of treatment with Dermagraft was several thousand of dollars higher.  For example, two applications of Theraskin cost approximately $1,400 total, while eight applications of Dermagraft cost about $10,400 total.

169.     Additionally, because Theraskin comes in two sizes, while Dermagraft only comes in one size, some portion of a Dermagraft piece is often wasted when used to treat smaller wounds.

170.     Such waste is extremely costly, considering that a piece of Dermagraft costs approximately $1,000 more than the small size of Theraskin.

171.     Numerous physicians have expressed to Harvey that Theraskin is more effective than Dermagraft including Dr. William Broyles (East Orange VA Medical Center), Dr. Rodney Harris (Altoona VA Hospital), Dr. Gottlieb (Baltimore VA Hospital), Dr. Layshia Fowler (Richmond VA Hospital), Dr. Louis Daw (Southern Nevada VA Podiatry Clinic), Nurse Practitioner Karen Yamada (Long Beach VA Hospital), and Dr. Michael Strauss (Long Beach VA Hospital).

172.     Although, on per patient overall treatment basis, both Theraskin and Apligraf are considerably less expensive than Dermagraft, and more effective, sales of Dermagraft dwarf those of Apligraf and Theraskin.

24

29

173.    In 2009 alone, sales of Dermagraft to the VA system increased from approximately 150 pieces (approximately $204,150 worth) in January to 700 pieces (approximately $952,700 worth) in August.

174.    In 2010, ABH's estimated monthly sales of Dermagraft to the VA system was about 4,000 pieces (approximately $5.4 million per month). This represents an increase of nearly 2,000% in less than a two year time period.

175.    Dermagraft's share of the VA market is approximately 95%.

176.    On more than one occasion, Harvey was told by VA physicians that they would not order Theraskin because of the gifts and other remuneration they receive from ABH.

177.    For example, one doctor told Harvey that he would not change to Theraskin because he "gets too much" from ABH for using Dermagraft.

178.    Another doctor, Dr. Rodney Harris, told Mr. Harvey that although he had tried Theraskin and it "worked," he would continue to prescribe more Dermagraft because "there are no fun and games with your company [Soluble Systems]."

179.    Dr. Harris also told Harvey that many of the patients he treated with multiple applications of Dermagraft "will never heal," but that "so long as I keep using Dermagraft I will continue to be invited to ABH dinners, trips, and other events." He added that "Theraskin works better than Dermagraft and is less costly," but "no one matches ABH's fun and games." Dr. Harris stated that ABH's "pay to play" model is "brilliant" and that "all the VA providers are going to take advantage of ABH perks until the Government catches on to what ABH is doing."

25

30

180. Another VA physician, Dr. Layshia Fowler, told ABH representative Steve Rowe that his hospital had good results using Theraskin, but they would continue to use Dermagraft so that they would continue to be invited to concerts, events, and other activities.

181. ABH's remuneration-based "marketing" scheme continues to pay off for the company, including its employees, in terms of sales.

182. Recently, in March of 2011, ABH Sales Representative Ricky Palmer sold over 500 pieces of Dermagraft in a single month.

183. That is the highest monthly sales number ever achieved by an ABH sales representative and it amounts to over $60,000 in monthly commissions for Palmer. It also equates to approximately $700,000 in sales for ABH.

184. One of Palmer's primary clients is Dr. Frykberg, the Chief Podiatrist working out of the VA Medical Center in Phoenix, Arizona.

185. ABH is the largest sponsor of the annual VA Desert Foot Conference, which takes place in Phoenix, Arizona every November. Dr. Frykberg is the director of this conference and the conference depends on such sponsorships in order to operate.

186. Furthermore, in April of 2010, Dr. Frykberg was the director of the first annual "Podiatric Residency Education Summit."

187. The Grand Sponsor of the conference was ABH.

## COUNT ONE: 31 U.S.C. §3729(a)(1)

188. Paragraphs 1-187 are incorporated herein.

189. Defendant knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to officers or employees of the United States Government.

26

190.     As a result of these false or fraudulent claims, the United States Government suffered damages.

## COUNT TWO:  31 U.S.C. §3729(a)(2)

191.     Paragraphs 1-190 are incorporated herein.

192.     Defendant knowingly made, used, or caused to be made or used, false records and statements to obtain the United States Government's payment of false or fraudulent claims.

193.     The false records and statements included, but may not be limited to, the representations made in Defendant's false certifications and other false statements to the Veterans Administration and its agents, through explicit and implicit certifications of compliance with federal regulations, statutes, and program instructions in order to get paid by the United States government.

194.     As a result of these false records or statements, the United States Government suffered damages.

## PRAYER

WHEREFORE, Plaintiff prays for the following relief:

1.     A permanent injunction requiring Defendant to cease and desist from violating the federal False Claims Act;

2.     Judgment against Defendant in an amount equal to three times the amount of damages the United States has sustained as a result of the Defendant's unlawful conduct;

3.     Civil monetary penalties for each false and fraudulent claim submitted to the United States by Defendant;

27

4. An award to Relator pursuant to 31 U.S.C. §3730(d);

5. An award of reasonable attorneys' fees, costs, and expenses;

6. Such other relief as the Court deems just and equitable.

## JURY DEMAND

Relator hereby demands a jury trial on all issues triable to a jury.

Respectfully submitted,

JONATHAN K. TYCKO
D.C. Bar No. 445851
ANDREA R. GOLD
D.C. Bar No. 502607
TYCKO & ZAVAREEI LLP
2000 L Street, N.W., Suite 808
Washington, D.C. 20036
(202) 973-0900
(202) 973-0950 (fax)
jtycko@tzlegal.com
agold@tzlegal.com

*For Relator Mark J. Harvey*

28

33

# EXHIBIT A

Revised
Box 17a 11-14-08 Don Ayers

| PAGE 1 OF 130 | | | | |
|---|---|---|---|---|
| SOLICITATION/CONTRACT/ORDER FOR COMMERCIAL ITEMS OFFEROR TO COMPLETE BLOCKS 17, 23, 24, & 30 | | | 1. REQUISITION NO. | BPA NO. |

| 2. CONTRACT NO. | 3. AWARD/EFFECTIVE DATE | 4. ORDER NO. | MODIFICATION NO. | 5. SOLICITATION NO. | 6. SOLICITATION ISSUE DATE |
|---|---|---|---|---|---|
| V797P-4155b | 12-01-2008 | | | RFP-797-FSS-99-0025-R5 | 02-01-2007 |

| 7. FOR SOLICITATION INFORMATION CALL: | a. NAME Federal Supply Schedule Helpdesk | b. TELEPHONE NO. (No Collect Calls) (708) 786-7737 | 8. OFFER DUE DATE/LOCAL TIME Open and Continuous |
|---|---|---|---|

| 9. ISSUED BY | CODE | 10. THIS ACQUISITION IS | See Clause A-FSS-31 |
|---|---|---|---|
| VA National Acquisition Center Federal Supply Schedule Service 049A1F2 P.O. Box 76, Bldg. 37, Hines IL 60141 Overnight Delivery should be mailed or hand delivered to the address located in Block 16 | | [X] UNRESTRICTED OR [X] SET-ASIDE: 100% FOR [X] SMALL BUSINESS [ ] HUBZONE SMALL BUSINESS [ ] SERVICE-DISABLED VETERAN-OWNED SMALL BUSINESS NAICS: 611410 SIZE STANDARD: $6,500,000 | [ ] EMERGING SMALL BUSINESS [ ] (SBA) |

| 11. DELIVERY FOR FOB DESTINATION UNLESS BLOCK IS MARKED [ ] SEE SCHEDULE | 12. DISCOUNT TERMS NET 30 | 13a. THIS CONTRACT IS A RATED ORDER UNDER DPAS (15 CFR 700) | 13b. RATING N/A |
|---|---|---|---|
| | | | 14. METHOD OF SOLICITATION [ ] RFQ [ ] IFB [X] RFP |

| 15. DELIVER TO | CODE | 16. ADMINISTERED BY | CODE |
|---|---|---|---|
| TO BE SHOWN ON INDIVIDUAL DELIVERY ORDER | | VA National Acquisition Center Federal Supply Schedule Service (049A1F2) 1st Avenue, 1 Block North of 22nd Street Bldg. 37 Hines IL 60141 | |

| 17a. CONTRACTOR/OFFEROR CODE | FACILITY CODE | 18a. PAYMENT WILL BE MADE BY | CODE |
|---|---|---|---|
| DUNS No. 78-279-6705 Advanced BioHealing, Inc 10933 N. Torrey Pines Rd. Suite 200 La Jolla, CA 92037 1-877-337-6247 TELEPHONE NO. | | TO BE SHOWN ON INDIVIDUAL DELIVERY ORDER | |
| [X] 17b. CHECK IF REMITTANCE IS DIFFERENT AND PUT SUCH ADDRESS IN OFFER | | 18b. SUBMIT INVOICES TO ADDRESS SHOWN IN BLOCK 18a UNLESS BLOCK BELOW IS CHECKED [ ] SEE ADDENDUM | |

| 19. ITEM NO. | 20. SCHEDULE OF SUPPLIES/SERVICES | 21. QUANTITY | 22. UNIT | 23. UNIT PRICE | 24. AMOUNT |
|---|---|---|---|---|---|
| FSC Class 6510 6515 6530 6532 | Medical Equipment and Supplies (See Continuation of SF 1449 - Schedule of Items for additional details) Special Item Number (SIN) A-20c | | | | |

(Use Reverse and/or Attach Additional Sheets as Necessary)

| 25. ACCOUNTING AND APPROPRIATION DATA 797 4537 B 633000 0161401V1 2580 | 26. TOTAL AWARD AMOUNT (For Govt. Use Only) Estimated $ 2,980,295.00 |
|---|---|

| [X] 27a. SOLICITATION INCORPORATES BY REFERENCE FAR 52.212-1, 52.212-4. FAR 52.212-3 AND 52.212-5 ARE ATTACHED. ADDENDA | [X] ARE [ ] ARE NOT ATTACHED |
|---|---|
| [ ] 27b. CONTRACT/PURCHASE ORDER INCORPORATES BY REFERENCE FAR 52.212-4. FAR 52.212-5 IS ATTACHED. ADDENDA | [ ] ARE [ ] ARE NOT ATTACHED |

| [X] 28. CONTRACTOR IS REQUIRED TO SIGN THIS DOCUMENT AND RETURN 1 COPIES TO ISSUING OFFICE. CONTRACTOR AGREES TO FURNISH AND DELIVER ALL ITEMS SET FORTH OR OTHERWISE IDENTIFIED ABOVE AND ON ANY ADDITIONAL SHEETS SUBJECT TO THE TERMS AND CONDITIONS SPECIFIED HEREIN. | [X] 29. AWARD OF CONTRACT REFERENCE: DATED NOVEMBER 6, 2008. YOUR OFFER ON SOLICITATION (BLOCK 5), INCLUDING ANY ADDITIONS OR CHANGES WHICH ARE SET FORTH HEREIN IS ACCEPTED AS TO ITEMS: See Summary Award Document |
|---|---|

| 30a. SIGNATURE OF OFFEROR/CONTRACTOR Donald G. Ayers | 31a. UNITED STATES OF AMERICA (SIGNATURE OF CONTRACTING OFFICER) Earnestine Corr |
|---|---|
| 30b. NAME AND TITLE OF SIGNER (TYPE OR PRINT) Don Ayers, Director National Accounts | 30c. DATE SIGNED 6-20-08 | 31b. NAME OF CONTRACTING OFFICER (TYPE OR PRINT) EARNESTINE CORR | 31c. DATE SIGNED 11/17/2008 |

AUTHORIZED FOR LOCAL REPRODUCTION PREVIOUS EDITION IS NOT USABLE

STANDARD FORM 1449 (REV. 3/2005) Prescribed by GSA - FAR (48 CFR) 53.212

35

| 18. ITEM NO. | 19. SCHEDULE OF SUPPLIES/SERVICES | 21. QUANTITY | 22. UNIT | 23. UNIT PRICE | 24. AMOUNT |
|---|---|---|---|---|---|
| | | | | | |

**32a. QUANTITY IN COLUMN 21 HAS BEEN**

☐ RECEIVED    ☐ INSPECTED    ☐ ACCEPTED, AND CONFORMS TO THE CONTRACT, EXCEPT AS NOTED: _____

| 32b. SIGNATURE OF AUTHORIZED GOVERNMENT REPRESENTATIVE | 32c. DATE | 32d. PRINTED NAME AND TITLE OF AUTHORIZED GOVERNMENT REPRESENTATIVE |
|---|---|---|
| 32e. MAILING ADDRESS OF AUTHORIZED GOVERNMENT REPRESENTATIVE | | 32f. TELEPHONE NUMBER OF AUTHORIZED GOVERNMENT REPRESENTATIVE |
| | | 32g. E-MAIL OF AUTHORIZED GOVERNMENT REPRESENTATIVE |

| 33. SHIP NUMBER | 34. VOUCHER NUMBER | 35. AMOUNT VERIFIED CORRECT FOR | 36. PAYMENT | | 37. CHECK NUMBER |
|---|---|---|---|---|---|
| ☐ PARTIAL   ☐ FINAL | | | ☐ COMPLETE   ☐ PARTIAL   ☐ FINAL | | |
| 38. S/R ACCOUNT NUMBER | 39. S/R VOUCHER NUMBER | 40. PAID BY | | | |

| 41. I CERTIFY THIS ACCOUNT IS CORRECT AND PROPER FOR PAYMENT | | 42a. RECEIVED BY (Print) |
|---|---|---|
| 41b. SIGNATURE AND TITLE OF CERTIFYING OFFICER | 41a. DATE | 42b. RECEIVED AT (Location) |
| | | 42c. DATE REC'D (YY/MM/DD)    42d. TOTAL CONTAINERS |

STANDARD FORM 1449 (REV 4/2002) BACK

Advanced BioHealing, Inc.
Contract Number V797P-4155b

## SUMMARY OF AWARD
### Addenda to SF 1449

**The Contract consists of the following documents:**

(a) FAR 52.212-4 Contract Terms and conditions – Commercial Items and Addenda

(b) GSA 552.212-72 Contract Terms and Conditions Required to Implement Statutes or Executive Orders – Commercial Item

(c) Advanced BioHealing, Inc's offer signed June 20, 2008 and Amendment One dated 02/01/2007 signed November 14, 2008.

(d) Revisions: Solicitation page 37 (8/1/08), Solicitation Page 40 (11/6/08), Solicitation page 53 (11/6/08), Solicitation page 114 (8/1/08), Solicitation page 116 (8/1/08) and Solicitation page 126 (8/1/08). Signatory Authority for Offers and Contracts/Company Information (8/1/08 and 8/11/08) and Standard Form 1449 (address correction in block 8) (11/14/08).

(e) Final Proposal Revision (FPR) Letter dated November 6, 2008.

(f) Awarded discounts are taken from the Advanced BioHealing, Inc's Dermagraft Price List effective January 1, 2008 consisting of one (1) page.

**A copy of the above price list identifying those products accepted for award, is attached hereto and made a part hereof.**

(g) Incorporated by reference: FAR 52.212-3 Offeror Representations and Certifications – Commercial Items

**Terms and Conditions as agreed to are as follows:**

(a) Contract period of: December 1, 2008 through November 30, 2013

(b) Discounts as identified on above cited Price List by Special Item Number (SIN) and /or Models and Maximum Order:

| SIN | Basic Discount | Awarded Maximum Order |
|-----|----------------|-----------------------|
| A-20 c | 5% | $100,000 |

(b) Minimum Order: One (1)

(c) Quantity Discount: Additional 2% taken off list price when 40 or more are purchased.

(d) Delivery Time: Within 24 hours After Receipt of Order (ARO)

(e) Expedited Delivery: None

(f) Prompt Payment: Net 30 days

1

Advanced BioHealing, Inc.
Contract Number V797P-4155b

(g) F.O.B. Destination Point(s): FOB Destination 50 states including Washington, D.C. and Puerto Rico.

(h) Warranty Provision: Advance BioHealing, Inc. guarantees the product furnished will be free from defects in material and workmanship for a period of 90 days from date of acceptance. Advance BioHealing, Inc. will replace material found defective for a period of 90 days with cost of replacement, including shipping charge, to be borne by Advance BioHealing, Inc. Under no circumstances will any product covered by this guarantee be returned without (a) advance notice to Advance BioHealing, Inc., or (b) obtaining shipping instructions from Advance BioHealing, Inc.

(i) Return/Exchange Goods Policy: Advanced BioHealing, Inc. stands behind the integrity of its product, Dermagraft. If for any reason you experience a problem with the product or its usage, contact your Advanced BioHealing, Inc Sales Representative or Advanced BioHealing, Inc's Customer Service Department at 1-877-337-6247 for a replacement. No product returns will be accepted unless ABH expressly agrees in advance to permit the return of such products. Products must be returned in the original unopened container and received by ABH prior to the product expiration date. No shipping charges will apply.

(j) Tracking Customer: In accordance with the Price Reduction Clause 552.238-72, the Government and Advanced BioHealing, Inc agree that Corporate (i.e. hospitals/ physician clinics) is the identified tracking customer for whom the contract award is predicated. During the course of this contract, for any sales under the Maximum Order, the net price for any awarded item is reduced to the identified tracking customers the Government net price will be reduced proportionately.

The established ratios are shown on the attached spreadsheet titled Discount Relationship (Government Price vs. Most Favored Customer (MFC) Price) Ratio dated November 14, 2008 consisting of one (1) page.

(l) Annual Rebate: None

(m) Exceptions: None

The lettered sections (a), (b), (c), (d), (e), (f), (g), (h), and (i) above under "Terms and Conditions as agreed to" are required in the "Information for Ordering Activities" section of your Published Federal Supply Schedule Pricelist.

Your tax I.D. number is required to be included on the Published Price List to facilitate payment by ordering activities.

Please be advised, the sole purpose of funds provided by the accounting data in Block 25 of the Standard Form 1449 is to fund the guaranteed minimum of $2,500 as stated in contract clause I-FSS-106. Hoever, the funds obligated at time of award do not constitute an order for supplies or services under this contract.

2

38

# GENERAL SERVICE ADMINISTRATION CONTRACTOR'S REPORT OF SALES

## Check one of the blocks to indicate the period (quarter) for which this report is being submitted

1. FY ____  
☐ 1st Quarter (Oct – Dec)    ☐ 2nd Quarter (Jan – Mar)    ☐ 3rd Quarter (Apr – Jun)    ☐ 4th Quarter (Jul – Sept)

| This report is required quarterly regardless of whether orders under the contract were received. See instructions before preparing. | 2. Contract No.:<br>V797P-4155b |
|---|---|
| TO:   DEPARTMENT OF VETERANS AFFAIRS<br>C/O FEDERAL SUPPLY SERVICES<br>P.O. BOX 76, Bldg 37<br>HINES, IL 60141 | 3. Contractor (Name and Address including Zip Code)<br>Advanced BioHealing, Inc.<br>10933 N. Torrey Pines Road, Suite 200<br>La Jolla, CA 92037-1054 |
| 4. Class No. and Title of Contract:<br>65IIA Medical Equipment & Supplies | 5. Total Sales: |

6. SALES RECEIVED annotate in corresponding blocks 6 (a-d), below. (If no sales whatsoever for items awarded under the above contract were received during the months covered by this report, enter $0 in the applicable columns below.

| (a) Special Item No. | (b) VA Sales | (c) OGA Sales | (d) Disaster Recovery Sales | (e) Total Sales |
|---|---|---|---|---|
| A-20 c | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

### NOTE: This report is due no later than 60 days after the end of the quarter

## CERTIFICATION

7. AS REQUIRED BY THE CONDITIONS OF THE CONTRACT, THERE ARE REPORTED ABOVE ALL GOVERNMENT SALES FOR ITEM(S) UNDER THE CONTRACT IDENTIFIED. THIS REPORT IS ACCURATE TO THE BEST OF OUR KNOWLEDGE AND BELIEF.

| AUTHORIZED OFFICIAL (Signature and official title) | |
|---|---|
| | Date: _____ |
| | Total Sales: _____ |
| Name and Phone Number for questions or clarifications: | Dollar Amount IFF: _____ |
| | Date of Electronic Payment Submission: _____ |

GSA Form 72 (Rev. 2/04) (Adapted for VA Use)

# EXHIBIT B

# LOAN OF EQUIPMENT AGREEMENT

The Agreement is made as of this ___ day of _____, 2009 ("the Effective Date") by and between Advanced BioHealing  10933 N. Torrey Pines Rd.  La Jolla, CA  92307 ("ABH") 1-877-337-6247 and _____, _____ ("Facility").

**Ultra Low Temperature Freezer**
**Brand_ Sanyo_____, Model__ MDF-C8V**

Exact Delivery Address:

| | |
|---|---|
| Account Name: | |
| Address: | |
| City, State, Zip: | |
| Phone Number: | Fax: |
| Contact Person: | Title: |

Billing Information & Address:

| | |
|---|---|
| Account Name: | |
| Address: | |
| City, State, Zip: | |
| Phone Number: | Fax: |
| Contact Person: | Title: |

WHEREAS, ABH has determined that the loan of certain equipment will allow ABH to provide more economical, efficient and effective delivery of DERMAGRAFT® to the Facility, and will better ensure the availability of DERMAGRAFT as patients present, thereby reducing return patient visits;

THEREFORE, ABH hereby loans to Facility the freezer described above and made a part hereof ("Equipment") on the following terms and conditions:

1.  **Purpose.**  The Equipment has been designed and shall be used exclusively for the purpose of storing DERMAGRAFT in accordance with ABH's instructions for use.  Facility agrees not to use the Equipment for any other purpose.

2.  **Term; Renewal.**  The term of this Agreement shall begin on the Effective Date and shall expire in one year.  Sixty (60) days prior to the expiration of the Agreement, ABH will re-evaluate the need for the Equipment at the Facility.  Based on the re-evaluation, ABH may renew the Agreement for a renewal term of up to twelve (12) months.  Renewals may occur successively at ABH's option.

3.  **Orders.**  Facility's initial order will be a minimum of five (5) pieces of DERMAGRAFT.  All future orders will be a minimum of five (5) pieces of DERMAGRAFT. This agreement shall not be construed as a DERMAGRAFT consignment agreement.   All DERMAGRAFT product referenced in this freezer loan agreement is purchased product of which the Facility has taken title and assumed ownership.

(continued):

4. **ABH Responsibilities.** ABH shall be responsible for the following: (a) purchase, installation and initial calibration of the Equipment on Facility's site, however if facility wishes to have their internal resources calibrate the unit ABH will require documentation of such procedure; (b) training the Facility's personnel on procedures in usage of DERMAGRAFT and maintaining the Equipment in accordance with the manufacturer's requirements; (c) providing a "Freezer Operating Procedures" document to the Facility; and (d) ensuring that DERMAGRAFT shipped to the Facility has a minimum thirty (30) days shelf life.

5. **Facility's Responsibilities.** Facility shall be responsible for the following: (a) rotation and utilization of DERMAGRAFT product inventory to ensure that the shortest dated product is used first. (b) monitoring of the chart recorder at least daily and upon each usage of DERMAGRAFT; (c) notification to ABH if the Equipment malfunctions; (d) notification to ABH of relocation of the Equipment within the Facility and verification that it has been recalibrated (e) following the guidelines recommended by the manufacturer, (f) assuring that Equipment is reserved solely for storage of DERMAGRAFT. All notifications required by the Facility to ABH as referenced in this section shall be made to ABH Customer Service Center in La Jolla, CA at (877) 337-6247.

6. **Freezer Calibration and Maintenance.** The ongoing freezer calibration and maintenance arrangements will also be managed by the Facility and must utilize guidelines recommended by the manufacturer as well as follow any JACHO and OSHSA guidelines that regulate the Facility.

7. **Risk of Loss.** Facility shall bear the risk of loss for the Equipment and shall return and deliver the Equipment to ABH promptly upon ABH's request in the condition in which ABH loaned the Equipment to Facility, ordinary wear and tear excepted.

8. **Repair.** All repairs shall be authorized in advance by ABH and shall be performed only by qualified technical personnel authorized by ABH.

9. **No Assignment.** Facility shall not dispose of the Equipment or assign any rights thereto or loan the Equipment to any third party. Facility shall keep the Equipment free of all liens of any kind and nature.

10. **Property of ABH.** The Equipment and all replacements and additions thereto shall remain the absolute property of ABH. The Equipment shall at all times be and remain personal property and shall not in any manner be permanently affixed or attached to any lands or building so that it becomes a fixture under applicable real estate law. ABH shall retain all rights attendant to or associated with the ownership of the Equipment, including, without limitation, the right to depreciate the Equipment for tax, accounting and all other purposes.

11. **Compliance with Law.** Facility shall comply with all laws, rules and regulations relating to the Equipment and its use.

(continued):

12. **No Warranties.** ABH does not make, and there are no representations or warranties, express or implied, statutory or otherwise, with respect to the Equipment or this Agreement or any schedule or amendment hereto and ABH shall not be deemed to make, now or hereafter at any time, any representation or warranty, express or implied, as to the quality of the material or workmanship of the Equipment or to the condition, design, merchantable quality, durability, operation or fitness for use or for any particular purpose of the Equipment.

13. **Termination.** Notwithstanding any other provision of this Agreement, either party may terminate this Agreement by giving thirty (30) days written notice to the other party. Upon termination or expiration of this Agreement, Facility will release the Equipment to ABH.

The parties, intending to be legally bound, have signed this Agreement as of the Effective Date.

**Advanced BioHealing**                   _____

By: _____        By: _____

Name: _____      Name: _____

Title: _____     Title: _____

**CIVIL COVER SHEET**

JS-44
(Rev. 2/11 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| UNITED STATES ex rel. Mark J. Harvey | ADVANCED BIOHEALING, INC. |

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF **80880**
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY) **FAIRFIELD (CT)**
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

TYCKO & ZAVAREEI LLP
2000 L STREET NW
SUITE 808
WASHINGTON, DC 20036
(202) 973-0900

**SEALED**

Case: 1:11-cv-00898
Assigned To : Walton, Reggie B.
Assign. Date : 5/13/2011
Description: General Civil

**JURY ACTION**

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff
● 3 Federal Question (U.S. Government Not a Party)
○ 2 U.S. Government Defendant
○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

○ **A. Antitrust**
☐ 410 Antitrust

○ **B. Personal Injury/Malpractice**
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

○ **C. Administrative Agency Review**
☐ 151 Medicare Act
Social Security:
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D. Temporary Restraining Order/Preliminary Injunction**
Any nature of suit from any category may be selected for this category of case assignment.
*(If Antitrust, then A governs)*

● **E. General Civil (Other)**     OR     ○ **F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food & Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 462 Naturalization Application
☐ 465 Other Immigration Actions
☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☒ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

44

○ **G.** *Habeas Corpus/ 2255*

☐ 530 Habeas Corpus-General
☐ 510 Motion/Vacate Sentence
☐ 463 Habeas Corpus - Alien Detainee

○ **H.** *Employment Discrimination*

☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)

*(If pro se, select this deck)*

○ **I.** *FOIA/PRIVACY ACT*

☐ 895 Freedom of Information Act
☐ 890 Other Statutory Actions (if Privacy Act)

*(If pro se, select this deck)*

○ **J.** *Student Loan*

☐ 152 Recovery of Defaulted Student Loans (excluding veterans)

○ **K.** *Labor/ERISA (non-employment)*

☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 730 Labor/Mgmt. Reporting & Disclosure Act
☐ 740 Labor Railway Act
☐ 790 Other Labor Litigation
☐ 791 Empl. Ret. Inc. Security Act

○ **L.** *Other Civil Rights (non-employment)*

☐ 441 Voting (if not Voting Rights Act)
☐ 443 Housing/Accommodations
☐ 444 Welfare
☐ 440 Other Civil Rights
☐ 445 American w/Disabilities- Employment
☐ 446 Americans w/Disabilities- Other

○ **M.** *Contract*

☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholder's Suits
☐ 190 Other Contracts
☐ 195 Contract Product Liability
☐ 196 Franchise

○ **N.** *Three-Judge Court*

☐ 441 Civil Rights-Voting (if Voting Rights Act)

**V. ORIGIN**

⊙ 1 Original Proceeding
○ 2 Removed from State Court
○ 3 Remanded from Appellate Court
○ 4 Reinstated or Reopened
○ 5 Transferred from another district (specify)
○ 6 Multi district Litigation
○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

31 U.S.C. 3729 et seq (False Claims Act), Recovery of damages and civil penalties pursuant to the False Claims Act

**VII. REQUESTED IN COMPLAINT**
CHECK IF THIS IS A CLASS ☐ ACTION UNDER F.R.C.P. 23
**DEMAND $** _ _ _ _ _ _ _ _ _ _ _ Check YES only if demanded in complaint
**JURY DEMAND:** YES ☒ NO ☐

**VIII. RELATED CASE(S) IF ANY**
(See instruction) YES ☐ NO ☐ If yes, please complete related case form

DATE May 13, 2011    SIGNATURE OF ATTORNEY OF RECORD   *Andrea Hold*

## INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence. Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C.; and 99999 if plaintiff is outside the United States.

III. CITIZENSHIP OF PRINCIPAL PARTIES. This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.  CASE ASSIGNMENT AND NATURE OF SUIT. The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.  CAUSE OF ACTION. Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII. RELATED CASES, IF ANY. If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.